IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHERYL HALL,                    )        CASE NO.  1:08 CV 759
                                )
            Plaintiff,          )
                                )
                                )        MAGISTRATE JUDGE McHARGH
                                )
        v.                      )
                                )
MICHAEL J. ASTRUE,              )        **MEMORANDUM OPINION**
Commissioner                    )
of Social Security,             )
                                )
            Defendant.          )

        This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the

undersigned is whether the final decision of the Commissioner of Social Security

("Commissioner") denying Plaintiff Cheryl Hall's application for Supplemental Security Income

("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.* is supported

by substantial evidence and, therefore, conclusive.

        For the reasons set forth below, the Court AFFIRMS the decision of the Commissioner.

## I.  PROCEDURAL HISTORY

        Plaintiff seeks judicial review of the Commissioner's final decision that she is not

disabled and therefore not entitled to SSI benefits.  Plaintiff filed an application for SSI benefits

on February 12, 2002, alleging that she had been disabled since January 21, 2002 because she

was depressed and did not want to go to work (Tr. 64-66, 77).   The Social Security

Administration ("SSA") denied her application initially, and Plaintiff did not appeal the denial (Tr. 41, 44-47).

On July 24, 2002, Plaintiff filed another application for SSI benefits, alleging a disability onset date of February 21, 2002 due to limitations related to bipolar disorder.  The SSA denied her application initially and upon reconsideration, and Plaintiff requested an administrative hearing (Tr. 42-43, 48-56). On June, 21, 2006, Administrative Law Judge ("ALJ") Peter R. Bronson determined Plaintiff had the residual functional capacity ("RFC") to perform light work and, therefore, was not disabled (Tr. 14-29). On appeal, Plaintiff claims that the ALJ erred by: (1) failing to properly characterize her non-exertional limitations; and (2) failing to recognize her obesity as a severe impairment.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Born on April 27, 1960, (age 46 at the time of the ALJ's determination), Plaintiff is a "younger individual."  *See* 20 C.F.R. §§404.1563, 416. 963.  Plaintiff last completed the tenth grade and has past relevant work as a housekeeper and laundry worker for a nursing home, a cleaner for a cleaning service, a cashier/busser/waitress for a restaurant, and a dishwasher (Tr. 117-24, 354-60).

### B.  Medical Evidence

Plaintiff alleges that she has been disabled since January 2002.  Thus, although the record contains medical evidence dating back to 2000, the Court's summary of the evidence focuses on the evidence closer in time to the alleged period of disability.

Dr. Felker performed a psychological examination of Plaintiff in May 2002 at the Agency's request (Tr. 167-71).  Plaintiff told Dr. Felker that she attended regular classes in school failed no grades (Tr. 167).  Dr. Felker noted that Plaintiff was 5'3" tall and weighed 290 pounds (Tr. 168).  Dr. Felker also noted that Plaintiff's hygiene was marginal and that her level of motivation was quite limited (Id.).  Plaintiff indicated that she suffered from limited motivation, frequent crying spells, and physical difficulties due to her weight problem (Id.)..  Plaintiff further indicated that she had been homeless in the previous year and was unable to keep a job (Id.).  Plaintiff reported that her typical day involved getting up at 6:30 a.m., making sure her children were up and ready for school, making the beds, doing the dishes, straightening up the house, and taking care of other chores (Tr. 169).  She stated that she tried to do other errands and get home by 4:00 p.m. when the children returned from school (Id.).  She then prepared dinner for her children, helped them with their homework, and watched television (Id.).  Plaintiff reported that she sometimes had trouble sleeping and that she did not socialize (Id.).

Dr. Felker administered the Wechsler Adult Intelligence Scale-III (WAIS-III), and Plaintiff obtained a Full Scale IQ of 62, a Verbal IQ of 63, and a Performance IQ of 65 (Id.).  These results placed Plaintiff in the Mildly Mentally Retarded range of functioning (Id.).  However, Dr. Felker indicated that these results did not accurately reflect Plaintiff's abilities, as Plaintiff's effort was minimal and it was likely that she was poorly motivated for the testing (Id.).  Dr. Felker estimated that Plaintiff was functioning at the dull normal level (Id.).  Plaintiff placed at the fourth grade level on a reading test, but here again, her effort was minimal (Id.).  Plaintiff's performance on a memory test was even weaker than on the WAIS-III, but Dr. Felker did not consider these test results to be an accurate indication of Plaintiff's memory capabilities

(Tr. 170). Dr. Felker diagnosed Plaintiff with major depression recurrent type and assigned her a Global Assessment of Functioning (GAF) score of 53 (Id.). Dr. Felker opined that Plaintiff was moderately impaired in most areas of work-related functioning (Id.).

Psychologist Dr. Pawlarczyk reviewed Plaintiff's claim file for the SSA in May 2002 and opined that Plaintiff:

- could understand both short and detailed instructions and remember work locations and procedures;

- could carry out both short and detailed instructions;

- might be somewhat slow in activity pace due to symptoms of depression and anxiety; could complete a normal workday without an unreasonable number of rest periods;

- could relate adequately to co-workers, supervisors, and the general public on a superficial basis, but would have some difficulty relating to others on a sustained basis;

- would function best in an environment where her interactions with others would be minimal;

- could make plans, travel independently, and was aware of environmental hazards;

- might have some difficulty adjusting to changes in routine; and

- could tolerate the stress involved in everyday work activity

(Tr. 172-88).

Plaintiff sought treatment from Bridgeway, Inc. from February to December 2002 (Tr. 190-228). Upon beginning treatment, she was reportedly struggling with depression, her mother's recent death and an inability to hold down a stable job (Tr. 190). Plaintiff improved

4

with treatment until she became homeless, at which time she also was noted to be noncompliant with treatment (Id.).  Bridgeway helped Plaintiff obtain a loan to get an apartment, but Plaintiff subsequently failed to appear for her appointments or to respond to letters (Id.).  Despite becoming homeless Plaintiff reportedly had started a program to become a nurse assistant and was hopeful of obtaining a job upon completing the program (Id.).  Plaintiff's medications included Depakote, Celexa and Klonopin (Id.).  Bridgeway closed Plaintiff's file in December 2002 due to noncompliance (Tr. 190).

Plaintiff saw a mobile psychiatric crisis team in June 2003 and noted that she had been off medication for a year (Tr. 230).  Plaintiff also noted that her twenty-year-old daughter, who had been supporting Plaintiff and her three minor children, moved out and left Plaintiff without a source of income (Tr. 230).  Plaintiff reported that she had left home alone only three times in a year (Id.).  She also reported that she experienced shaking, poor concentration, decreased sleep and increased depression (Tr. 231-32).  Plaintiff was diagnosed with the following: depressive disorder not otherwise specified; bipolar disorder by history; panic attack with agoraphobia; and rule out malingering versus dependent personality disorder (Tr. 234).  Plaintiff was assigned a GAF score of 50 (Id.).

Mr. Davis performed a psychological examination of Plaintiff in December 2003 at the request of the SSA (Tr. 235-41).  Mr. Davis did not administer any tests (Tr. 235).  Plaintiff told Mr. Davis that she had been in special classes and had completed nine years of school (Tr. 236).  Plaintiff was 5'3" and 280 pounds (Tr. 237).  There was no abnormality in the content of Plaintiff's conversation with Mr. Davis, but she established almost no eye contact and claimed that her head raced when she tried to sleep (Id.).  Plaintiff reported crying spells, body shakes,

anxiety attacks about four times per week, feelings of worthlessness, and fear of leaving the house (Tr. 237-38).  Her performance on a mental status examination showed deficiencies in cognitive functioning, insight, and judgment (Id.).  Plaintiff expressed that her day typically consists of sitting and feeling sorry for herself (Tr. 239).  Mr. Davis diagnosed Plaintiff with panic disorder with agoraphobia, adjustment disorder with anxiety and depression, and borderline intellectual functioning (Tr. 240).  Mr. Davis further opined that Plaintiff did not appear to be dealing well with the stresses and pressures of her life (Tr. 241).  He assigned Plaintiff a GAF score of 50 (Tr. 240).

Plaintiff sought assistance from Bridgeway again in November 2003 (Tr. 243-44).  She claimed that she had to be told like a child to bathe, eat, and get up, and that she needed someone watching over her or she would stay depressed and vegetative (Tr. 244).  Plaintiff reported that she left her house about twice a week (Tr. 245).  In December 2003, Bridgeway staff noted that Plaintiff "can utilize and resource public transportation and has good follow through with simple tasks" (Tr. 248).  Plaintiff reportedly weighed 305 pounds (Tr. 250).

Drs. Chambly and Melvin performed psychological reviews of Plaintiff's claim file in February and June 2004, respectively (Tr. 254-72).  They noted that Plaintiff did not follow through with treatment, although Plaintiff's progress notes indicated that her condition improved when she was compliant with her medication (Tr. 271).  They opined that Plaintiff could perform simple, routine tasks (Tr. 271).

In June 2004, Bridgeway staff noted that Plaintiff had not been keeping her appointments but took the medications she had been prescribed (Tr. 280).  Plaintiff reported that she had been taking care of her personal needs and home (Id.).  She reported no side effects from her

medications (Tr. 279).  Bridgeway staff noted Plaintiff's continued "significant obesity" and that Plaintiff smoked half a pack of cigarettes daily (Tr. 279).  Plaintiff indicated that she struggled with symptoms of generalized anxiety and depression (Id.).

In September 2004, Plaintiff reportedly continued to have symptoms of depression, but she was diagnosed as having bipolar disorder in partial remission (Tr. 278).  She began new medication (Id.).

In December 2004, Plaintiff again was noted to be noncompliant with appointments (Tr. 277).  Plaintiff stated that she was unable to keep her appointments because she had many illnesses within her family (Id.).

In April 2005, Plaintiff reported that she was so depressed that it was hard for her to get out of bed, though she also reported increased anxiety and racing thoughts (Tr. 275).  Plaintiff reportedly quit smoking but remained obese (Id.).

Plaintiff's progress notes from June 2005 indicate that Plaintiff "needs constant encouragement and reminders of appointments" (Tr. 274).  Plaintiff had missed several appointments due to illness, transportation issues, and deaths in the family (Id.).  Plaintiff was encouraged to get help from the Bureau of Vocational Rehabilitation, but she failed to show up for any of her appointments (Id.).

### C.  Hearing Testimony

Dr. Schweid testified as the Medical Expert ("ME") at Plaintiff's administrative hearing.  The ME opined that Plaintiff did not have an impairment or combination of impairments that meet or equal a listing (Tr. 324).  He testified that Plaintiff had severe impairments including asthma and mental problems that various medical sources had classified as: bipolar disorder,

major depression recurrent, anxiety, and panic disorder with agoraphobia (Tr. 325).  The ME testified that the results of Dr. Felker's testing of Plaintiff's intelligence, memory and academic ability were invalid due to Plaintiff's poor effort (Tr. 326-27).  He opined that Plaintiff was moderately impaired in activities of daily living, social functioning, and concentration, persistence and pace (Tr. 329).  He indicated that he was not aware of any episodes of decompensation of extended duration (Tr. 329-30).  The ME specifically disagreed with psychologist Davis' diagnosis of agoraphobia because he believed that the record does not reflect a level of agoraphobia approaching the level required under the Listing (Tr. 330-31).  The ME opined that Plaintiff was limited as follows:

- no extremes of temperature or humidity;

- no high concentrations of duct, pollens or toxic fumes;

- routine, low-stress tasks;

- no tasks involving intense interpersonal interactions, including no confrontation, negotiation, arbitration or responsibility for supervising other people or keeping them safe; and

- no requirement for close teamwork

(Tr. 331-33).

The ME noted that there were some difference between his opinion and some of the other opinions in the medical record, but that those differences generally were in Plaintiff's favor (Tr. 333-34).  The ME acknowledged that psychologist Davis' opinion was somewhat more pessimistic than his (Tr. 334-35).

On cross-examination, the ME noted that Plaintiff had experienced a period of some decompensation when she was not using medication, did not have counseling, and was apparently homeless (Tr. 336-38).  The ALJ noted that the "C criteria" of the Listings required that the indicated symptoms be present despite compliance with treatment, and Plaintiff's increased symptoms occurred when she was non-compliant (Tr. 339).  The ME opined that Plaintiff would not have abnormal absences from work if the job met all of the requirements he set forth previously in his testimony (Tr. 343-44).

Mr. Burkhamer testified as a vocation expert ("VE") at Plaintiff's hearing.  The ALJ asked the VE whether a person with the following limitations could work:

- no exposure to extremes of temperature or humidity;

- no exposure to high concentrations of dust, pollens, or toxic fumes;

- only simple, routine work;

- no work involving high or strict production quotas;

- no confrontation, negotiation, or arbitration with other people, including supervisors, co-workers, and the public;

- no management, supervisory work, or responsibility for the safety or welfare of other people;

- only perfunctory involvement with the public;

- no contact with crowds; and

- only routine contact with co-workers in a routine setting, with no close teamwork

(Tr. 357-58).

The VE testified that such a hypothetical individual could perform Plaintiff's past relevant housekeeping and laundry work (Tr. 359).  The VE also testified that the individual could work as a dishwasher

On cross-examination, the VE confirmed that an individual who was absent from work once a week could not do any jobs (Tr. 360-61).

### III.  DISABILITY STANDARD

A claimant is entitled to receive SSI benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. §§ 404.1505, 416.905.

### IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits

determination, then that determination must be affirmed.   *Id*.   If the Commissioner's determination is supported by substantial evidence, it must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V. <u>ANALYSIS</u>

**A.  Whether the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence because it fails to account for plaintiff's "difficulties sustaining work activity and interacting with others"**

The ALJ found that Plaintiff is capable of performing a range of light work with the following limitations: (1) no work that requires exposure to extremes of temperature and humidity; (2) no work that requires exposure to high concentrations of dust, pollen, or toxic fumes; (3) only routine work, and no work that is complex; (4) no work that requires strict production quotas; (5) no work that requires intense interpersonal contacts; (6) no work that requires confrontation, arbitration, or negotiation with other people; (7) no work that requires more than perfunctory involvement with the general public; (8) no work that requires working in crowds; (9) no work that requires Plaintiff to be responsible for the health, safety or welfare of other people; (10) no work that requires teamwork with co-workers or supervisors, although

Plaintiff can do work that requires no more than routine contact in a routine setting with co-workers and supervisors (Tr. 18-19).

Plaintiff argues that this RFC assessment fails to account for her difficulties sustaining work activity — specifically Plaintiff's difficulties interacting with others and "need for additional breaks and absenteeism" (Doc. 15, at 14).  Plaintiff's evidence regarding these limitations consists largely of her own reports that she is unable to leave the house, that she constantly struggles with her symptoms of depression, that she lacks motivation and needs constant encouragement and reminders to do things, and that she has been fired from jobs due to her poor attendance and inability to control her moods.  Plaintiff also notes Dr. Bastani's 2000 and 2001 assessments that Plaintiff suffers from recurrent depression and Mr. Davis' assessment that "she seems to be unable to deal very effectively with her life at this time" (Tr. 163, 156, 238).  Plaintiff further points to her sister's report that Plaintiff is "too nervous to drive, cannot get out of her house, and cannot gather the motivation to get dressed in the morning" (Doc. 15, at 13).  Plaintiff argues that because the hypothetical given to the VE failed to quantify Plaintiff's difficulties interacting with others and "need for additional breaks and absenteeism," the ALJ's reliance on the VE's testimony in response to that hypothetical is not supported by substantial evidence.

Because much of Plaintiff's evidence in support of her claim comes from her own testimony and reports, such evidence depends for its reliability upon Plaintiff's own credibility. Plaintiff suggests that the ALJ failed to accord proper weight to her reports and testimony.  An ALJ's credibility findings deserve deference because the ALJ has the opportunity to observe the claimant at the hearing and to assess her demeanor and subjective complaints. *Buxton v. Halter,*

246 F.3d 762, 773 (6th Cir. 2001).  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  Walters v. Comm'r, 127 F.3d 525, 531 (6th Cir. 1997).  However, if an ALJ rejects a claimant's assertions regarding her complaints and abilities as less than fully credible, he must articulate his reasons for doing so.  See Cross v. Comm'r, 373 F.Supp.2d 724, 732-33 (N.D. Ohio 2005).

> It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Id. (citing SSR 96-7p).

The ALJ in this case found that Plaintiff's allegations regarding her symptoms, to the extent they suggested limitations beyond those articulated in his RFC assessment, to be less than fully credible.  He gave several reasons for so finding.  For example, he stated:

> [Plaintiff] was the primary caregiver for three children who were minors at all times relevant to this proceeding.  There is no evidence in the record that the children were neglected or were otherwise given less than adequate care.  In [a report dated March 4, 2002, Plaintiff] said that she would get her children dressed and send them to school.  In [a report dated July 24, 2003, Plaintiff] said that she was taking care of her children and was not going to give them up.  In [a report dated October 4, 2003, Plaintiff] said that she took care of her three children, including sending them to school, feeding them, dressing them, and bathing them.  Her mental health care providers noted with approval that she kept her children, not only at home but even when she moved with them into a homeless shelter . . . . These facts undermine the credibility of [Plaintiff]'s allegations that she lacked motivation and was otherwise psychologically impaired with respect to her ability to carry out responsibilities

(Tr. 21).  He further stated:

> [Plaintiff]'s various treating physicians and other health care providers never said that she was incapable of working or incapable of keeping medical appointments. On the contrary, on at least one occasion, a mental health care provider said that 'CPST will continue to encourage clt [sic] toward employment'

(Id.).

The ALJ also pointed to the ME's testimony that, in his opinion, the record does not demonstrate that Plaintiff is completely unable to function outside of her home (Tr. 25).  He also noted the ME's testimony that Plaintiff's absenteeism should not be excessive if her work is in full compliance with his RFC finding (Tr. 26).  The ALJ agreed with both of these assessments.

The Court finds that the above evidence and analysis constitute good reasons for discounting Plaintiff's credibility regarding the severity of her symptoms.  As the ALJ notes, the record does not contain any medical opinions indicating that Plaintiff is unable to leave her home, go to work, or keep her appointments.  The record also does not reflect that Plaintiff failed to care adequately for her children, which suggests that Plaintiff retained the motivation to perform a number of parental tasks.

The Court further finds that substantial evidence supports the ALJ's RFC determination. First, contrary to Plaintiff's assertions, the RFC determination does account for Plaintiff's difficulties in interacting with others.  Plaintiff testified that she does not like to leave her house because she does not like being around crowds of people (Tr. 348). However, Plaintiff apparently had no problem being around her children, her sister, her case worker, her friend who takes her to appointments or any of her treating sources.  Thus, Plaintiff's problem does not appear to be that she cannot interact with anyone at all; only that she cannot be around a large number of people at once.  The ALJ's RFC determination provides that Plaintiff can perform no

14

work that requires intense interpersonal contacts; no work that requires confrontation, arbitration, or negotiation with other people; no work that requires more than perfunctory involvement with the general public; no work that requires working in crowds; no work that requires Plaintiff to be responsible for the health, safety or welfare of other people; and no work that requires teamwork with co-workers or supervisors, although Plaintiff can do work that requires no more than routine contact in a routine setting with co-workers and supervisors. These limitations account adequately for Plaintiff's problems with people, even as she describes them.

Second, the Court finds that substantial evidence supports the omission of a limitation in the ALJ's RFC determination pertaining to Plaintiff's alleged need for excessive absenteeism. "[E]xcessive absenteeism can be a relevant consideration in determining whether a claimant is disabled." *Johnson v. Astrue*, 2008 WL 2115616 at *3 (E.D. Tenn. May 19, 2008) (citing *Sharp v. Barnhart*, 152 Fed.Appx. 503, 508-10 (6th Cir. 2005) and *Jones v. Sec. of Health and Hum. Servs.*, 1985 WL 12990 at *3 (6th Cir. Feb. 8, 1985). However, "residual functional capacity is meant to describe the claimant's residual *abilities* or what a claimant *can* do." *Olive v. Comm'r of Soc. Sec.*, 2007 WL 5403416 at *10 (N.D. Ohio Sept. 19, 2007) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002)) (emphasis added).  Plaintiff's testimony and reports throughout the record make clear that she does not like to leave her home.  The record also reflects that Plaintiff lost a total of ten to eleven jobs in a period of two years, in part due to her failure to show up for work.  The relevant questions, however, are whether Plaintiff *can* leave her house to go to work and whether she *can* sustain work activity, not whether she simply does

not want to do so.  In other words, what would be the underlying reason for the absenteeism Plaintiff claims is an inevitable consequence of her condition?

Plaintiff's testimony regarding her inability to leave the house is as follows:

Q:  Why is it hard for you to get of the house to leave?

A:  I'm just not able, I just don't want to leave my house.  There was an incident five years ago where I didn't leave for a year.  And recently I haven't left for 31 days.  I, I just did not want to leave the house.  I'm scared of being around people.  I get panicky. . . .

Q:  And is it just being, you said scared of people, is it just crowds of people or --

A:  Basically just being around crowds of people

(Tr. 348).  Plaintiff further testified that she does not have her case manager anymore because she was terminated for failing to show up for appointments (Tr. 349).  Plaintiff stated that her case manager would remind her of her appointments and take her to every other appointment (Id.). When her case manager did not come to pick Plaintiff up for appointments, Plaintiff would not go  (Id.).  Plaintiff did not find alternative transportation  (Id.).  When asked whether she has been to treatment anywhere else besides Bridgeway, Plaintiff responded that she is going to see a psychiatrist at West Side Ecumenical Ministry (Tr. 350).  However, she stated that she has not yet gone to any appointments there because she has been depressed, she has not been out of the house in a month, and is "basically waiting for the way to get out of the house and go" (Tr. 351).

However, the ME testified:

Well, I have to balance what she says kind of against what's in the record.  The record implies a history of non compliance.  And they use the term non compliant.  They don't say that she can't comply.  That's the big problem here.  If she – if it were so that she really from a symptomatic standpoint couldn't comply because she was so panicky or so depressed that she couldn't possibly go out, couldn't find a way to get to her appointments, and so forth then I would agree

16

> that it's unlikely that she could sustain any work effort. . . . But I don't think that her inability to leave her lodging is, is total or complete or even approaches that and that's I think what's being alleged here.  I just don't see it

(Tr. 346-47).

Plaintiff's own testimony does not support the conclusion that she is consistently unable to leave her house; only that she does not do so when she does not have a ride and that she does not like to leave because she does not like being around crowds (Tr. 348-49).  The Court notes that this "transportation" issue is somewhat complex.  On the one hand, travel difficulties that are extrinsic to the claimed disability cannot be considered when determining whether a person is under a disability.  *See Harmon v. Apfel, 168 F.3d 289, at 292-93 (6th Cir. 1999)*.  Thus, to the extent Plaintiff does not leave her house because her friend and/or case worker is not available to take her, that factor should not influence the Court's finding of disability.  However, Plaintiff's ability to use alternative means of transportation may be linked to a certain degree to her inability to be around crowds of people.  That factor, to the extent it is at play, does appear to be somewhat relevant to the Court's disability determination because Plaintiff's fear and/or dislike of crowds is not extrinsic to her functional limitations.  The record contains conflicting pieces of evidence regarding this issue.  In December 2003, Bridgeway staff noted that Plaintiff "can utilize and resource public transportation and has good follow through with simple tasks" (Tr. 248). Mr. Davis noted in December 2003, on the other hand, that Plaintiff "cannot use public transportation because of not wanting to be around people" (Tr. 236).   Significantly, the ALJ found that Plaintiff is limited from work activities involving crowds of people.

The purpose of the medical expert is to advise the ALJ on medical issues, answer specific questions about the claimant's impairments, the medical evidence, the application of the listings,

and functional limitations based on the claimant's testimony and the record.  *See* 20 C.F.R. § 416.927(f)(2)(iii); *see also* HALLEX I-2-5-32.  An ALJ may rely on the opinion of a medical expert to resolve conflicts in the medical evidence.  *See Hale v. Secretary of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987); *Schumer v. Comm'r of Soc. Sec.*, 109 Fed. Appx. 97, 101 (6th Cir. 2004).  The ME in this case opined that Plaintiff's professed inability to leave the house is not total or complete, and he emphasized that the evidence reflects Plaintiff's *noncompliance* — not her inability to comply — with appointments.  He further opined that Plaintiff's absenteeism should not be a problem if her work met all the requirements in the ALJ's RFC.  Given the discrepancies in the evidence regarding the impact of Plaintiff's RFC on her ability to get out of the house, the ALJ was entitled to rely on the ME's opinion that Plaintiff's absenteeism should not be excessive or affect her ability to work.  Thus, the Court finds that the ALJ properly omitted from his RFC determination a limitation related to Plaintiff's absenteeism.

Third, the Court finds that substantial evidence supports the omission of a limitation in the ALJ's RFC determination pertaining to Plaintiff's alleged need for "additional breaks." Plaintiff is not particularly clear about how the record supports her need for additional breaks, how often she would require such breaks, or how long in duration each break must be.  Thus, it is not clear to the Court that, even if Plaintiff did require the additional breaks she claims she needs, such a requirement would establish Plaintiff's disability.  Plaintiff appears to proffer as evidence in support of this claim her reports to Mr. Davis that she experiences anxiety attacks approximately four times per week each lasting 15 minutes in duration and that she lost many jobs in a two year period due to her depression, inability to control her moods, and frequent crying spells.  (Doc. 15, 12-15).  Here again, Plaintiff relies on her own reports in support of her

claim that she needs additional breaks, and as explained above, the ALJ properly discounted Plaintiff's credibility regarding the severity of her symptoms. There is no clinical evidence indicating that Plaintiff experiences panic attacks or the frequency or duration of the alleged attacks. Thus, the Court finds that the ALJ properly left out of his RFC determination a requirement that Plaintiff have "additional breaks."

The hypothetical given to the VE is identical to the ALJ's RFC determination. Since substantial evidence supports the RFC determination, substantial evidence also supports the ALJ's hypothetical, and the ALJ was entitled to rely on the VE's testimony in response to the hypothetical. The VE stated that a person with Plaintiff's RFC could perform Plaintiff's past relevant work, and Plaintiff does not challenge any other aspect of the VE's testimony. For the reasons stated above, Plaintiff's argument that the ALJ erred in formulating Plaintiff's RFC is without merit.

**B.      Whether the ALJ failed to properly consider Plaintiff's obesity**

Plaintiff's argument regarding her obesity appears to be two-fold. First, Plaintiff points to her BMI, which has ranged from 49.6 to 54.9 throughout the record. Under SSR 02-1p and the *Clinical Guidelines*, Plaintiff's obesity can be characterized as "extreme" on all recorded dates. According to Plaintiff, the fact that her obesity is so evidently "extreme" stands in direct contradiction to the ALJ's finding that Plaintiff's obesity does not constitute a severe impairment. Second, Plaintiff argues that the ALJ erred "by failing to evaluate the fluctuation of [Plaintiff]'s weight over time and its impact upon her functioning as required by SSR 02-1p." The court addresses each argument separately below.

**1.      Plaintiff's "extreme" obesity and the ALJ's finding that Plaintiff's obesity does not constitute a "severe impairment"**

19

SSR 02-1p provides:

> There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment. *Neither do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes.* Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

(Emphasis added).

Under SSR 02-1p, the mere fact that Plaintiff's obesity can be characterized as "extreme" because Plaintiff's BMI is above 40 does not mean that her obesity constitutes a "severe impairment." As stated in the Ruling, descriptive terms alone do not establish the existence of a "severe impairment" for purposes of Social Security law. Thus, the Court cannot say that ALJ erred by failing to find that Plaintiff's obesity amounted to a severe impairment merely because it can be characterized as "extreme."

Moreover, as Defendant points out, Plaintiff does not put forward any evidence suggesting that her obesity has had a significant impact on her ability to function. Some of the evidence suggests otherwise. For instance, one of Plaintiff's progress notes from Bridgeway states: "Patient is very obese and she realizes this but she does not feel overly upset by this saying, '[m]y family is all obese and it's just something we have to deal with'" (Tr. 275). Although there may be other evidence in the record tending to suggest that Plaintiff's obesity has had a significant impact on her ability to function — such as Plaintiff's statement in a form for the Bureau of Disability Determination dated February 26, 2002 that she often sits around feeling sorry for herself, wondering, among other things, "why am I so fat[?]," (tr. 88), and her statement in a Disability Report dated July 17, 2004 that she has trouble walking around in part because of pain in her joints (tr. 140) — it is Plaintiff's burden to come forward with such

evidence, and this Court is not entitled to review her case de novo.  The Court also notes in making its determination the near lack of evidence in the record indicating what impact, if any, Plaintiff's obesity has on her ability to function and the fact that Plaintiff's various treatment plans never appear to mention a "plan of attack" for Plaintiff's obesity or that combating her obesity is even a goal. Because substantial evidence supports the ALJ's conclusion that Plaintiff's obesity does not have a significant impact on her functional abilities, Defendant is entitled to judgment as a matter of law on this issue.

## 2.    The impact of Plaintiff's weight fluctuations on her ability to function

As noted above, Plaintiff also argues that the ALJ erred "by failing to evaluate the fluctuation of [Plaintiff]'s weight over time and its impact upon her functioning as required by SSR 02-1p." SSR 02-1p states with regard to fluctuations in weight: "[b]ecause an individual's weight may fluctuate over time and minor weight changes are of little significance to an individual's ability to function, it is not appropriate to conclude that an individual with obesity has medically improved because of a minor weight loss." This statement appears under a heading entitled, "What Amount of Weight Loss Would Represent 'Medical Improvement'?", and indeed, the Ruling's discussion of weight fluctuations seems dedicated on the whole to the impact such weight fluctuations have on a person's *improvement* (and potential to "recover" from disability), not as a factor that *contributes* to a person's disability.  The Ruling does not make any statements regarding whether weight fluctuations, by themselves, can contribute to disability and does not impose any requirement on ALJs to make such an evaluation.  Thus, Plaintiff's argument that the ALJ erred by failing to evaluate her weight fluctuations and their impact upon her ability to function is without merit.

## VI.  **DECISION**

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  April 30, 2009.